STATE v. HOUSTON OIL CO. OF TEXAS et al. (No. 5494.)

(Court of Civil Appeals of Texas. Austin. Feb. 21, 1917. Rehearing Denied April 18, 1917.)

1. PUBLIC LANDS ⊚=173(3)—DISPOSITION OF SCHOOL LANDS—IMPLIED REPEAL.

Acts 24th Leg. c. 47, revising generally all laws relating to the disposition of school land and the incorporating therein sections of earlier laws without making any change in them, impliedly repealed all earlier statutes on the subject.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 547, 548.]

2. PUBLIC LANDS ⊚=173(3) — DISPOSITION—WHAT LAW GOVERNS.

In determining the validity of the sale of state lands, the law in force at the time of the sale governs.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 547, 548.]

3. STATUTES ⊚=219—CONSTRUCTION—AMBIGUITY.

When a statute is ambiguous and the construction placed upon it by the department of government charged with its execution does not result in serious injustice or hardship, such construction, particularly when long continued, will be adopted and upheld by the courts.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296–297.]

4. PUBLIC LANDS ⊚=173(6) — DISPOSITION — STATUTES—CONSTRUCTION.

Acts 24th Leg. c. 47, relating to the disposition of school lands, provides in section 1 that all public school lands shall be sold or leased under the provision of the act, while the second section confers power and authority on the commissioner of the land office to carry it into effect and declares that it shall be the duty of such commissioner to call on the Attorney General for advice whenever there is doubt as to the meaning of the act or any of its provisions. The third and fourth sections provide for the classification of lands as agricultural, pasture, and timber lands, while the fifth section declares that whenever any portion of such land has been classified it shall be subject to sale, but to actual settlers only, and in quantities of not less than 40 acres or over 640 acres. Sections 6 and 7 provide for the sale of such lands and fix the prices, while section 8 undertakes to protect those who might be bona fide settlers on the land at the time the law went into force. Section 9 declares that all sales shall be made by the Commissioner of the General Land Office, and he shall prescribe suitable regulations whereby all purchasers shall be required to reside upon the land purchased by them for three consecutive years next succeeding their purchase, etc. Sections 10 and 11 confer the right upon purchasers on making proof of three years' occupancy to obtain patents to the land, while section 11 prescribes the necessary procedure for the protection of the state when interest is not paid. Section 16 declares that the Commissioner of the General Land Office shall adopt such regulations for the sale of the timber as may be deemed necessary and judicious, and that such timber shall not be sold for less than $5 per acre cash, unless the land be sparsely timbered or containing timber of little value, in which case it shall not be sold at less than $2 an acre. The section further declares that the purchaser shall have five years within which to remove the timber, and that all timbered lands from which timber has been cut may be placed on the market and sold as agricultural or grazing lands, but that the purchaser and his vendee shall have the right to purchase the land upon which such timber was situated at $2 per acre cash at any time before the expiration of the period of removal. Acts 26th Leg. c. 137, amended section 16 in some particulars, but continued the provisions allowing the purchaser of the timber to purchase the land. The commissioner of the land office applied to the Attorney General for the construction of the act, and the Attorney General rendered an opinion construing the act as allowing purchasers of timber to buy lands on which the timber stood without restriction and without actual settlement; it having been the custom to sell timber on land without requiring actual settlement. Held that, where such construction was long acquiesced in, the title of a purchaser of timber to the land which he subsequently acquired from the state cannot be attacked on the ground that he was not an actual settler and purchased an acreage in excess of that authorized by section 5.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 547, 548.]

5. PUBLIC LANDS ⊚=178(2)—RIGHT OF STATE —PURCHASER.

The state cannot attack the title of a corporation to timbered land because the purchaser of such land at the time of making his purchase had conveyed the timber to the corporation, it appearing that the purchaser acted as agent for the corporation and transferred the land to it.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 580.]

---

⊚=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**6. PUBLIC LANDS ⬦═178(2) — PURCHASE — RIGHT OF STATE.**

Where the owner of timber conveyed the same to a corporation and then bought the land itself conveying it to a corporation, the state cannot, the transaction being authorized by statute, forfeit the title to the land on the ground that the corporation was exceeding its charter powers by its acquisition, although it might in a proper proceeding obtain a judgment forfeiting the corporate charter or require the corporation to divest itself of such property.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 580.]

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Action by the State of Texas against the Houston Oil Company of Texas and others. From judgment which granted only part of the relief sought, plaintiff appeals. Affirmed.

B. F. Looney, Atty. Gen., G. B. Smedley, Asst. Atty. Gen., and W. F. Ramsey, of Dallas, for the State. Andrews, Streetman, Burns & Logue, of Houston, H. O. Head, of Sherman, Oswald S. Parker, T. M. Kennerly, and McDonald Meachum, all of Houston, Henry G. King, of Dallas, Head, Dillard, Smith, Maxey & Head, of Sherman, and Batts & Brooks, of Austin, for appellees.

KEY, C. J. The state of Texas, acting through the Attorney General's department, brought this suit against the Houston Oil Company of Texas, the Kirby Lumber Company, and the Maryland Trust Company; all three being private corporations. The state sought to cancel patents which it had issued to 152 separate tracts of land, and also sought a recovery of the several tracts of land referred to. There was a nonjury trial, which resulted in a judgment for the state for the recovery of one of the tracts, and in favor of the defendants as to all the other tracts, and the state has appealed.

The Attorney General and his able assistant, Mr. G. B. Smedley, have filed an elaborate brief which presents their side of the case as clearly and forcibly as could well be done. The statement in their brief of the nature of the case, the facts established, and the questions of law involved, are conceded to be substantially correct, and we therefore copy as follows from their brief:

"This is a public school land case. It has to do with the validity, or invalidity, of the sales of 151 separate tracts of public school land in the counties of Jasper, Newton, San Augustine, Sabine, Hardin, Jefferson, Orange, and Tyler. The tracts are described in detail in a schedule attached to plaintiff's third amended original petition. In this schedule are given the dates the applications were filed, the names of the purchasers of the land, the dates of the patents, the names of the patentees, the dates the timber on the lands was purchased, and the names of the purchasers of the timber. The lands were attempted to be purchased under the school land law of 1895 (Acts 24th Leg. c. 47) and its amendments. Most of the tracts were patented in the year 1902. The state sues to recover these lands and to cancel the patents and for damages for timber and turpentine taken from the lands, alleging that the lands are now claimed and possessed by appellee, the Houston Oil Company of Texas, and that the other two appellees, Kirby Lumber Company and Maryland Trust Company, claim some sort of interest in the lands. All of the appellees are corporations.

"The lands sued for naturally divide themselves into three groups, arising from the different sections of the law under which they were attempted to be purchased. For convenience, these three groups will hereafter be designated as 'timbered lands,' 'detached lands,' and 'settlement lands.'

### "Timbered Lands.

"Most of the lands sued for are in this group. They are described in paragraph 4 of plaintiff's third amended original petition. They are in all 107 tracts. It is alleged that these lands were attempted to be purchased by John H. Kirby on the dates shown in the schedule by virtue of his alleged ownership of the timber on the lands, under the terms of section 16 of the school land act of April 4, 1895 (R. S. 1895, art. 4218q) and its amendments. This section is as follows: 'The Commissioner of the General Land Office shall adopt such regulations for the sale of timber on the timbered lands as may be deemed necessary and judicious. Such timber shall not be sold for less than five dollars per acre, cash, except in such cases as the commissioner may ascertain by definite examinations by an approved agent appointed by him for that purpose, to be paid by the purchaser, to be sparsely timbered or containing timber of but little value, in which case he may sell the timber on such sections or part of sections at its proper value; provided, such timber is sold at not less than two dollars per acre. The purchaser shall have five years from the date of his purchase within which to remove the timber therefrom, and in case of failure to do so, such timber shall thereby be forfeited to the state without judicial ascertainment; provided, that all timbered lands from which the timber has been cut and taken off may' be placed on the market and sold as agricultural or grazing lands, according to classifications to be made by the land commissioner; provided, that the purchaser or his vendees of any such timber shall have the right to purchase the land upon which such timber so purchased is situated at two dollars per acre, cash, at any time before the expiration of five years from date of purchase of timber under the provisions of this chapter.'

"It is alleged in the petition and shown in the schedule that John H. Kirby and other persons, on the several dates shown, purchased from the state the timber on these lands. The timber on 44 of these tracts was purchased after the enactment of the school land act of 1895 and before the amendment of section 16 of said act in 1899, while the timber on the balance of the timbered lands, being 63 tracts, was purchased from the state subsequent to the amendment of section 16 in 1899. This amendment went into effect August 25, 1899. It appears on page 149 of the General Laws of 1899, and so much of section 16, as so amended, as is pertinent, is as follows: 'The Commissioner of the General Land Office shall adopt such regulations for the sale of timber on the timbered lands as may be deemed necessary and judicious. Such timber shall not be sold for less than five dollars per acre, cash, except in such cases as the commissioner may ascertain by definite examination by an approved agent appointed by him for that purpose, to be paid by the purchaser, to be sparsely timbered or containing timber of but little value, in which case he may sell the timber on such sections or part of sections at its proper value; provided, such timber is sold at not less than two dollars per acre, and that the contract for the sale of said

timber shall specify the character of timber sold; and provided further, that no timber shall be removed from the land sold except timber specified in the contract. The purchaser shall have five years from the date of his purchase within which to remove the timber therefrom, and in case of failure to do so, such timber shall thereby be forfeited to the state without judicial ascertainment; provided, that all timber lands from which the timber has been cut and taken off may be placed on the market and sold as agricultural or grazing lands, according to classifications to be made by the land commissioner; provided, that the pruchaser or his vendees of any such timber, heretofore or hereafter bought from the state, shall have the right to purchase for cash the land upon which such timber so purchased is situated, at two dollars per acre, cash, at any time before the expiration of the time allowed by law for the removal of said timber as provided by law. * * *'

"It is conceded that the right to purchase these timbered lands under section 16 is controlled by the law in effect at the time the timber was purchased from the state.

"The Application to Purchase the Timbered Lands.

"The applications to purchase these lands are alleged to have been accompanied by the following affidavit: 'I, John H. Kirby, do solemnly swear that I am the owner of the timber situated on the above-described land, purchased under the aforesaid acts, and that said timber has not been cut or taken off of said land; that my post office address is Houston, in Harris county, Texas.'

"It is further alleged that at said time an affidavit, substantially the same as the one set out, was required by the Commissioner of the General Land Office to be made and to accompany each application to purchase lands under said acts.

"Detached Lands.

"In this group are 39 tracts, most of them in Hardin county. They are described in paragraph 5 of the third amended original petition. It is alleged that they were attempted to be purchased under the terms of section 26 of the school land act of April 4, 1895 (R. S. 1895, art. 4218y), on the theory that the lands were isolated and detached from other public lands. Section 4218y is as follows: 'The Commissioner of the General Land Office may withhold from lease any agricultural lands necessary for purposes of settlement; and no agricultural lands shall be leased if in the judgment of the commissioner they may be in immediate demand for settlement, but such lands shall be held for settlement, and sold to actual settlers only, under the provisions of this chapter; and all sections or fractions of sections in all counties organized prior to the first day of January, 1875, except El Paso, Presidio and Pecos counties, which sections are isolated and detached from other public lands, may be sold to any purchaser except to a corporation without actual settlement,' at $1 per acre, upon the same terms as other public lands are sold under the provisions of this chapter.

"The latter part of this section was amended in 1899 so as to read as follows: '* * * And all surveys and fractions of surveys in all counties organized prior to the first day of January, 1875, which surveys are isolated and detached from other surveyed school lands, may be sold to any purchaser, except to a corporation, without actual settlement at not less than one dollar per acre, upon the same terms as other public lands are sold under the provisions of chapter 129 of the Acts of 1897.' Acts 1899, p. 235.

"As shown by the schedule, practically all of these lands were purchased after the amendment of 1899. The applications to purchase the detached lands are alleged to have contained the following affidavit: 'I, ———, do solemnly swear that I am buying said land for my own use and not for any other person or corporation, and that said land is not occupied by any one; that my post office address is ——— in ——— county, Texas.'

"And it is further alleged that an affidavit substantially the same as the one set out above was required by the Commissioner of the General Land Office to be made by each applicant to purchase detached lands and to accompany each application. The lands had been appraised as agricultural and grazing, and were applied for and purchased at from $1.25 to $3 per acre: one-fourtieth of the purchase money being paid and the obligation of the purchaser executed for the deferred payments.

"Settlement Lands.

"The remaining six tracts are alleged to have been purchased on condition of settlement by the various persons and on the several dates shown in the schedule under application, in compliance with the existing law respecting the purchase of settlement lands. They are described in paragraph 6 of the third amended original petition. These lands also were classified as grazing and agricultural and were purchased at from $1 to $3 per acre by payment of one-fortieth of the purchase price and execution of obligations for the deferred payments.

"Grounds of Invalidity of the Sales of the Timbered Lands.

"Appellant alleged that the attempted purchases of these lands were invalid for six several reasons:

"(1) Because John H. Kirby, on the same day and at the same time, filed applications to purchase more than four sections of said lands, and, further, because said John H. Kirby, at the time of the filing of his applications, had theretofore purchased from the state more than four sections of public school land.

"(2) Because none of the applications to purchase these lands complied with the law, in that they did not contain the affidavit of the applicant that he was in good faith a settler on the land, that he was applying to purchase the same for a home, that no other person or corporation was interested in the purchase of the land, etc., and because said applicant was not, at the time any of the applications were made and filed, and did not become at any time thereafter, an actual settler on any of the land applied for, or on any land to which the land was applied for as additional, and none of the lands applied for was isolated or detached.

"(3) Because each of the tracts was applied for under a collusive agreement between John H. Kirby and the Houston Oil Company of Texas, a corporation, that said lands should be acquired for the benefit of said corporation, and because said corporation was interested in the purchase of said lands, and they were in fact applied for for the use and benefit of said corporation.

"(4) Because the purchase money which was paid to the state for the land applied for and the money which was paid for the issuance of the patents was paid by the Houston Oil Company of Texas, a corporation, and the land was patented to John H. Kirby for the benefit of the Houston Oil Company of Texas, and that the filing of the applications, the making of the awards, and the issuance of the patents amounted, under said circumstances, to sales of said lands to a corporation in violation of the law.

"(5) Because the lands were sought to be purchased under a law which gave the owner of the timber the right to purchase the land at $2

per acre by virtue of his ownership of the timber, and the said John H. Kirby at the time he applied to buy the lands was not the owner of the timber on any of the lands, and was therefore not a qualified purchaser, and, though he had theretofore owned the timber on some of said lands, he had, before the applications were filed, parted with all his right, title, or interest in and to the lands and timber.

"(6) Because, as has been shown, applicants to purchase the lands under said law were required by the land office to accompany their applications with the affidavit of the applicant that he was the owner of the timber, and the affidavits which accompanied the applications to purchase said land were untrue and the sales were attempted to be predicated upon false affidavits.

"Grounds of Invalidity of the Sales of Detached Lands.

"There are some 15 separate grounds of invalidity as to these lands, some of which apply to all and some of which apply only to certain of the detached lands. The first five of the grounds hereinafter set out apply to all of the detached lands, while the balance apply to the particular tracts described in detail in the petition:

"(1) Because each of the applicants to purchase said lands had at the time of the filing of their applications theretofore purchased from the state more than four sections of land.

"(2) Because in the original purchases from the state there was collusion between John H. Kirby and C. M. Votaw, or between other persons and Kirby and Votaw, and the lands were not purchased for the benefit of the individual purchaser, but for the benefit of some other person as well. This ground is set out fully in subdivisions 'd' and 'e' of paragraph 8 of the third amended original petition.

"(3) Because the Commissioner of the General Land Office at said time required that the affidavit hereinbefore set out that the purchaser of said lands was buying the same for his own benefit must accompany each application, and the attempted sales were therefore predicated on false affidavits, in that other persons than the applicant were interested in the purchases.

"(4) Because the money, whether purchase money or fees, paid to the state for the issuance of patents for each tract of said lands, was paid by the Houston Oil Company of Texas, a corporation, and each of the patents was issued to the patentee for the benefit of the Houston Oil Company of Texas, and that these facts constituted sales of said lands to a corporation.

"(5) Because each of these tracts were at the time they were classified and appraised, and at the time the applications to purchase were filed, in fact timbered land and were valuable chiefly for the timber, and had no value, or practically no value, either for agricultural or grazing purposes; that these facts were a matter of common knowledge and were known, or by the use of ordinary diligence could have been known, both by the Commissioner of the General Land Office and by the applicants to purchase the lands; that these lands were therefore subject to sale only as timbered lands at the price of not less than $5 per acre and for cash; and that the action of the Commissioner of the General Land Office in classifying and appraising the lands as agricultural or grazing and selling them as such for less than $5 per acre, and on terms, amounted to such mistake as to the subject-matter of the contract or to such legal fraud as authorizes the state to set aside said sales.

"(6) Because after many of the tracts were originally purchased they were transferred and conveyed by the purchasers to John H. Kirby and other persons for the benefit of the Houston Oil Company of Texas, to be held in trust for said corporation and to be patented for the benefit of said corporation, and said conveyances were filed in the General Land Office and the vendees became the substitute purchasers of said tracts for the use and benefit of said corporation, and said tracts were afterwards patented to said individuals for the benefit of said corporation, and that these transactions amounted to a sale by the state of said lands to said corporation in violation of the law.

"(7) Because certain of said tracts, after they were originally purchased, were conveyed to certain persons who filed the conveyances in the General Land Office and became the substitute purchasers of said lands from the state, and said conveyances were made to said persons for the use and benefit of John H. Kirby, which amounted to collusion in the purchase of said lands from the state.

"(8) Because the tracts mentioned in subdivisions 'aa,' 'bb,' 'cc' of paragraph 10 of plaintiff's trial amendment, at the time they were applied for, were not isolated and detached from other public school land and were not applied for on condition of settlement, and said attempted purchases were therefore void.

"Grounds of Invalidity of the Sales of Settlement Lands.

"Appellant on the trial made no contention for the recovery of any of the settlement tracts, except section 2, Dick Walker, in Hardin county, and section 100 in Jefferson county, since it appeared that the appellees were not claiming or in possession of said other tracts. As to section 2, Dick Walker, it was alleged that after the purchase of same from the state, and before the completion of the three years' occupancy, it was sold and conveyed to F. M. Wells, who purchased the same under a collusive agreement between said Wells and C. M. Votaw that the conveyance to Wells was filed in the General Land Office and he became the substitute purchaser from the state, not for his sole use and benefit, but for the use and benefit of said Votaw.

"As to section 100 in Jefferson county, it was alleged that, after the purchase of same from the state, J. M. Carpenter conveyed the same to C. M. Votaw, and the conveyance to Votaw was filed in the General Land Office, and Votaw became the substitute purchaser from the state; but said conveyance was made to Votaw, not for his own use, but for the use and benefit of said Votaw and John H. Kirby.

"As to both of these tracts—section 2, Dick Walker, and section 100, Jefferson county—it was alleged that the purchase money and fees paid to the state when the land was patented were paid by the Houston Oil Company of Texas, a corporation, and that the patents were issued to the patentees for the benefit of the Houston Oil Company of Texas, and that these transactions amounted to the sale of said lands to a corporation. As to both of these tracts, it was alleged that they were in fact timbered lands, but were by mistake or legal fraud classified and awarded as agricultural or grazing lands; the allegations being the same as those made with reference to the erroneous classifications and sales of detached lands.

"Grounds of Forfeiture of the Sales of All Three Groups of Land.

"It is alleged in the petition that, in the event any valid sales were made of the lands, these sales were forfeited for two reasons, to wit:

"First, because all the lands were transferred to and acquired by the Houston Oil Company of Texas, a corporation, before patent in violation of the law, and became thereby forfeited to the state, and the state is entitled to recover the land.

"Second, as to each group, it is also alleged that the purchasers failed to reside upon and improve the lands as required by law. No real issue was made on this allegation. Appellant was not able to prove that the purchasers of

the settlement lands failed to reside upon them, and the evidence clearly shows, and we believe it will be conceded, that the purchasers of the timbered lands and the detached lands did not undertake to reside upon them.

## "Exceptions to the Petition and the Trial Court's Rulings on the Exceptions.

"Appellees filed answers containing a multitude of special exceptions to the various grounds of recovery set out in the petition, and a denial of practically all of the facts alleged in the petition. Most of these exceptions were sustained by the trial court, and most of the questions of law raised by the petition, and consequently most of the issues of fact joined, were settled and eliminated by the court's rulings on the pleadings.

## "The Trial Court's Rulings on the Exceptions as to Timbered Lands.

"By sustaining exceptions as to timbered lands, the trial court made the following rulings:

"(1) That the limitation of four sections to one purchaser does not apply to lands purchased under section 16 of the act of 1895, or under said section as amended in 1899.

"(2) That the timbered lands were subject to sale under said section 16, as contained in the original act of 1895, and as amended in 1899, without settlement, whether isolated and detached or not.

"(3) That the timbered lands could be purchased under said law by a corporation, and that therefore the purchase by an individual for a corporation was valid.

"(4) That since the timbered lands could be purchased by a corporation, under said laws, they could be patented to an individual for a corporation.

"(5) That the acquisition of timbered lands, purchased under said laws, by a corporation before patent, does not forfeit the sale or give the state the right to recover the land.

## "The Trial Court's Rulings on the Exceptions as to Detached Lands.

"(1) That the limitation of four sections to one purchaser has no application to lands detached and isolated from other surveyed public school lands purchased under section 26 of the act of 1895 and its amendments.

"(2) That collusion between individuals in the original purchase of isolated or detached lands, under said laws, will not invalidate the sale.

"(3) That collusion in the substitute purchase of detached lands between an individual and a corporation, or between individuals, will not invalidate the sales.

"(4) That a purchase of detached land, under said laws, is valid, even though predicated upon an affidavit required by the Commissioner of the General Land Office that the purchase is being made for one's own benefit and that no other person or corporation is interested in the same, when in fact the purchase is made for the benefit of another person and another person is interested in the purchase.

"(5) That the payment of the balance of the purchase money of detached lands, purchased under said laws, by a corporation, and the issuance of the patents to an individual for a corporation, does not amount to a sale of such land to a corporation by the state, and does not invalidate the sale.

"(6) That when lands valuable only for the timber, and openly and notoriously so, are classified and sold under said laws as grazing and agricultural at not exceeding $3 per acre and on 40 years' time, instead of not less than $5 per acre, and for cash, the sales, in the absence of actual fraud on the part of the commissioner, cannot be set aside in the name of the state, either on the ground of fraud or on the ground of mutual mistake.

"The same ruling was made as to mistake and legal fraud in the classification and sale of the settlement lands.

## "Issues of Fact and Questions of Law on Which the Case was Tried.

"The issues of fact on which the case was tried before the court without a jury, or at least so many of them as appellant will present in this brief, are as follows:

## "Issues as to the Timbered Lands.

"Appellant alleged that John H. Kirby, who was the purchaser of the timbered lands under section 16 of the act of 1895, and its amendment of 1899, was not the owner of the timber, or any of the same, on said lands when the applications to purchase the lands were made and filed, and that, as to those lands on which said Kirby had at one time owned the timber, he had, at the time his applications to purchase the lands were made and filed, already parted with all his right and title and interest in the lands on which the timber was situated, and he was therefore not a qualified purchaser of the lands, or any of them.

"Appellant further alleged that the affidavit which accompanied the applications of Kirby to the effect that he was the owner of the timber was required by the Commissioner of the General Land Office to be made and to accompany each application, and for that reason, and because Kirby was not the owner of the timber, the attempted purchases were predicated upon false affidavits, and were therefore invalid.

"In response to these allegations, the appellees answered:

"(1) That at the time of the making of the applications, John H. Kirby was either the purchaser of the timber or the vendee of the purchaser, and in either event had the right under the statute to purchase the land, the contention being that the original purchaser of the timber, or any vendee under him, even though not the owner of the timber at the time his application to buy the land was filed, would nevertheless be a qualified purchaser under the law.

"(2) That if Kirby and the other purchasers of the timber had, before Kirby applied to buy the lands, transferred to the Houston Oil Company of Texas the land and the timber on it, Kirby repurchased the timber and took a deed to it and became the owner of the timber before filing his applications to buy the land.

"(3) That, if it is true that Kirby was not the owner of the timber when he applied to buy the land, he had not been paid the purchase money for the timber or the land which he had sold the Houston Oil Company of Texas, and said corporation was indebted to him in a large sum, and that for these reasons Kirby had such an equitable interest in the timber that he was entitled to buy the land.

"(4) That, if it was true that the Houston Oil Company of Texas and not Kirby was the owner of the timber, it was therefore entitled to buy the land, and Kirby, in buying the land, acted as the agent of the Houston Oil Company of Texas and bought it for said company, and therefore the purchase was valid.

"(5) That the commissioner of the land office had no authority to require the filing of an affidavit that the applicant was the owner of the timber, and that therefore the sales were not invalid, even though the affidavits were untrue.

"(6) That, if the commissioner of the land office had the authority to require such affidavit, Kirby was the owner of the timber and the affidavit was true.

"Appellant by several supplemental petitions joined issue on the foregoing allegations, and, as to the deed which Kirby was alleged to have taken from the Houston Oil Company of Texas before he purchased the lands, the following allegations were made by appellant, to wit: That no such deed was executed and delivered con-

veying the timber to said Kirby; that, if such deed was executed and delivered, it was not executed and delivered in good faith and did not in fact convey to the grantee the timber on said land, and was not intended by the parties to the deed to have such effect; that said deed was wholly without consideration, was but a colorable transfer and a means of evading the law, was wholly without effect and void; that the grantee neither took nor claimed any right or title to said timber under said deed; and that it was never intended by the parties to such deed that the grantee under it should acquire any interest whatever in said timber.

### "Issues as to the Detached Lands.

"The only issues on which trial was had as to the detached lands, and which appellant will present in this brief, are whether or not section 216, H. & T. C. in Hardin county, and the two tracts out of section 218, H. & T. C., in Hardin county, were in fact isolated and detached from other public school land at the time of the attempted purchases.

### "Issues as to the Settlement Lands.

"As to section 2, Dick Walker, grantee, in Hardin county, the issue tried was whether or not there was collusion in the substitute purchase of the land by F. M. Wells.

"As to section 100, in Jefferson county, it was contended on the trial by appellant that there was collusion between C. M. Votaw and John H. Kirby in the substitute purchase of this section; that this section, though sold upon condition of settlement, was before patent transferred to and acquired by a corporation, and was patented to the said Votaw for the Houston Oil Company of Texas, a corporation, the purchase money being paid to the state by said corporation, which amounted to a sale of said settlement school land to a corporation.

"The appellees Kirby Lumber Company and Maryland Trust Company, both of which are corporations, made a common defense with the appellee the Houston Oil Company of Texas; the Kirby Lumber Company's interest in the lands sued for herein being a timber contract under which it had acquired the right to cut all the timber on the lands, and the interest of the Maryland Trust Company arising out of an assignment of the proceeds of this timber contract and a mortgage on the lands executed by the Houston Oil Company of Texas. These two instruments will be more fully explained hereinafter. These two appellees claimed to be innocent purchasers for value of the rights in the lands claimed by them.

### "Trial Court's Findings of Fact and Conclusions of Law.

### "As to the Timbered Lands.

"The trial court, on the request of appellant, filed findings of fact and conclusions of law. In paragraphs 1 to 13, inclusive, of the findings of fact, the trial court set out in detail the purchases from the state of the timber on the timbered lands, together with the transfers of the timber from the original purchasers to the Houston Oil Company of Texas, in most instances, and in other instances to John H. Kirby for the benefit of the Houston Oil Company of Texas, in pursuance of a contract of Kirby's theretofore made to convey or cause to be conveyed to the Houston Oil Company of Texas the said lands and other properties. These findings show that, before Kirby filed his applications to purchase said lands, the timber on the lands described in paragraphs 1 to 10, inclusive, of said findings, was conveyed to the Houston Oil Company of Texas, and that the timber on the lands described in paragraphs 11 to 12 of said findings, was conveyed to Kirby for the benefit of the Houston Oil Company of Texas. The timber on the one tract described in paragraph 13 was conveyed by the original purchaser to Kirby,

but it does not appear from the court's findings whether for the benefit of the Houston Oil Company of Texas or not.

"The trial court's conclusions of law, with reference to the timbered lands, are contained in paragraphs 1 and 2 of the conclusions of law, and are as follows:

"'(1) Some of the findings of fact filed herein embrace findings which may be more properly designated as conclusions of law than as findings of fact. Without repeating the same here, all such findings are hereby referred to and adopted as conclusions of law.

"'(2) At the time John H. Kirby applied for and purchased from the state the timbered lands described in the findings of fact, he held the legal title to all of the timber situated upon said land. And by reason of his ownership of the legal title to the said timber, and by reason of his personal and pecuniary interest in the acquisition of said land from the state by the Houston Oil Company of Texas, in the particulars as disclosed by the findings of fact, I conclude that said Kirby was authorized under the terms of article 4218q, Revised Statutes, to purchase said lands from the state; and that the sales to him of said lands by the state were valid and lawful sales, vesting in him the legal title to said lands subject to the equitable interest and ownership of the Houston Oil Company of Texas.'

### "As to the Detached Lands.

"As to section 216 and the two tracts out of section 218, the trial court found, as shown in paragraphs 25 to 27 of the findings of fact, that at the date the applications to purchase these tracts were filed they were isolated and detached from other surveyed school lands and were so shown by the maps and records of the General Land Office. The court concluded on this finding that the sales of these tracts were valid.

### "As to the Settlement Lands.

"With reference to section 2, Dick Walker, in Hardin county, the trial court found that before the completion of the three years' occupancy this tract was conveyed to F. M. Wells, who purchased it under a collusive agreement with C. M. Votaw for the joint use and benefit of Wells and Votaw; that the deed was filed in the General Land Office and Wells became the substitute purchaser from the state. On these findings the court concluded that the state was entitled to recover judgment for said tract against the appellees, but that the patent should not be canceled for the reason that the evidence did not show title to said tract in any of appellees through any regular chain of title, and the patentee was not a party to the suit.

"As to section 100, in Jefferson county, the court found that, after the completion of the occupancy of said section, J. M. Carpenter, the original purchaser, transferred the same to C. M. Votaw, who paid to the state the balance of the purchase money, and who received a patent to said section; that the conveyance from Carpenter to Votaw was for the joint benefit of Votaw and John H. Kirby, who was interested with Votaw in the purchase; that before the patent was issued the deed from Carpenter to Votaw was filed in the General Land Office. On these findings of fact, the court concluded that, since the three years' occupancy of this tract had been completed before it was transferred to Votaw, the fact that it was purchased by Votaw in collusion with Kirby would not render the sale to Votaw illegal.

"Judgment was rendered for the appellees for all the lands sued for, except that the state recovered judgment against appellees for the title and possession of section 2, Dick Walker, in Hardin county. The state recovered no judgment for damages. Within two days from the date of the judgment, appellant filed a motion

for a new trial, which was overruled by the court on the 29th day of October, 1914, and appellant excepted and gave notice of appeal to this honorable court.

#### "Brief History of the Titles.

"The whole case and the assignments of error to be presented by appellant will doubtless be much better understood by the court after a reading of the following brief explanation of the original ownership of the lands and timber involved in this suit, with a history of the organization of the two corporations the Houston Oil Company of Texas and the Kirby Lumber Company, and on account of the method by which the land and timber were acquired by the two corporations. The explanation which follows is based upon the facts as appearing in the record in this case:

"Prior to the year 1901, John H. Kirby was the owner of many thousand acres of land and timber in east Texas. In addition to the individual ownership of land and timber, he owned land and timber, or timber, jointly with other persons, among whom were C. M. Votaw, Pickman & Wharton, Wilson D. Wing, and others. In addition to this, he had interests in a number of corporations owning land and timber in that section of the state, and, in addition to the ownership of interests in such corporations, he had options to purchase lands and timber or timber, owned by various individuals and corporations. Among these corporations were Beaumont Lumber Company, Kirby Land & Lumber Company, J. F. Keith Company, Cow Creek Tram, Reliance Lumber Company, and others. He owned at that time, individually or in connection with other persons or corporations, approximately half a million acres of land. Some of this land was titled, some patented, some of it was school land, and some of it consisted of timber standing on school land. These interests had been acquired by Kirby through many years. The plan was conceived early in the year 1901 of putting these properties together in two corporations. Kirby and one Patrick Calhoun, a financier of New York, were the organizers of the two corporations Houston Oil Company of Texas and the Kirby Lumber Company. In April, 1901, these two gentlemen entered into a promoters' agreement, which agreement is set out in full on pages 75 to 79 of the statement of facts. This agreement recites that the parties to the contract control, by way of ownership or otherwise, about 850,000 acres of oil and timber land in the state of Texas, which it is their purpose to vest in two corporations. It is provided that a corporation shall be organized (the Houston Oil Company of Texas) with a capital stock of not less than $35,000,000, of which $20,000,000 shall be common stock and $15,000,000 preferred stock. This corporation shall acquire 'by purchase from the parties hereto the said oil and timber lands and will pay therefor the entire of its common stock and such sum in cash as the parties shall agree.' To secure the money for such payment, so much of the preferred stock as is necessary shall be sold; the purchasers thereof to be given an equal share of the common stock. The balance of the common stock not so used is to be divided between the parties to the contract. After the purchase of the lands, a contract shall be made whereby the corporation (Houston Oil Company of Texas) shall sell to Kirby the entire stumpage on the land at prices of from $3 to $5 per 1,000 feet. A corporation to be known as the Kirby Lumber Company is to be organized for the purpose of taking over the timber contract, which corporation shall have a capital stock of not less than $7,500,000, of which $2,500,000 shall be preferred stock. Kirby shall pay in cash to said Kirby Lumber Company, when organized, $2,500,000 in payment of its entire preferred stock, and in payment of $5,000,000 of its common stock shall

transfer and make over to the Kirby Lumber Company the timber contract. The foregoing is a brief statement of the substance of the promoters' agreement.

"In pursuance of this promoters' agreement, the two corporations were chartered on July 5, 1901; the purpose of the Houston Oil Company being 'establishing the maintaining an oil company with the right and power to acquire, own and hold lands by lease or purchase for said business and for the purpose of prospecting for, developing, saving, transporting, refining and marketing minerals of whatever kind, coal, petroleum, fuel oils, illuminating oils and lubricating oils; also the right to erect, build and own all necessary oil tanks, cars and pipes necessary for the handling and transportation of all the oil produced by this company and for the operation of its business.' The capital stock of the Houston Oil Company of Texas, as shown by its charter, is $10,000,000 preferred stock and $20,000,000 common stock. The purpose of the Kirby Lumber Company is as follows: 'The establishing and maintaining a lumber company, with the right and power to acquire, hold and own lands by lease or purchase for the purpose of acquiring the supply of lumber, timber and logs necessary to the conduct of said business to purchase, lease, erect and operate all necessary saw mills, planing mills, dry kilns, tram roads and all other necessary incidents to such business; to manufacture and sell lumber, timber and logs; together with the purchase and sale of such goods, wares and merchandise used for such business.' The capital stock of the Kirby Lumber Company, as shown by its charter, is $10,000,000, being $5,000,000 of preferred stock and $5,000,000 of common stock. According to Mr. Kirby's testimony, the plan in the organization of these two companies was that 'the Houston Oil Company of Texas should acquire and hold the land and the Kirby Lumber Company should acquire the timber from the Houston Oil Company of Texas, the owner of the land.' In another place, he testified that the Houston Oil Company of Texas was organized to acquire all of his properties, that is, the properties which he owned himself, and which were owned by corporations and of which he was a stockholder, and his option on other properties in which he had no financial interest.

"When the Houston Oil Company of Texas was first organized, it had no physical property. No money was put into the treasury for its common stock, and, in order to secure title to the lands and timber, it became necessary for it either to exchange its preferred stock for the land and timber, or to sell its preferred stock for money and buy with this money the land and the timber. On the day the two corporations were chartered, John H. Kirby addressed to the Houston Oil Company of Texas a written proposition to sell to it his land and timber and the land and timber in which he had interests and on which he had options. This written proposition is set out on page 19 and following of the statement of facts. Briefly stated, the substance of this proposition is as follows:

"Attached to the proposition were two schedules, one marked 'Exhibit A' and the other 'Exhibit B.' By the proposition Kirby proposes, within a period of 240 days from the date of the acceptance of the proposition by the Houston Oil Company of Texas, to sell and convey, or cause to be conveyed, to the Houston Oil Company of Texas all the oil and timber properties described in the schedule marked Exhibit A 'for the sum and price of $20,000,000 in your common stock fully paid and nonassessable, subject, however, to the payment by you of the respective amount in cash due or that shall become due, as the purchase price of the several properties mentioned in said schedule, not to exceed $17,500,000, and which indebtedness you are to assume and pay.' Among the lands described in Exhibit A attached to this proposition are:

"Estate of Caroline Pickman, deceased, 38,922 acres.

"Kirby Land & Lumber Company, 68,942 acres.

"John H. Kirby, 90,447 acres.

"Kirby and Votaw, 29,145 acres.

"Kirby and Wing, 7,588 acres.

"In this proposition Kirby also proposes to sell and assign to the Houston Oil Company of Texas all his options on the lands described in the schedule attached to the proposition and marked 'Exhibit B,' and agrees to use his best efforts to secure the conveyance to said corporation of said properties upon payment by the corporation of the consideration therefor. Among the lands described in Exhibit B are:

"Beaumont Lumber Company, 100,000 acres.

"J. F. Keith and J. F. Keith Company, 5,509 acres.

"Geo. Adams and Cow Creek Tram, 41,477 acres.

"In this proposition Kirby offers to buy from the Houston Oil Company of Texas the timber on the land to the amount of 8,000,000,000 feet and pay therefor the aggregate sum of $38,250,000 in semiannual installments. This timber contract he proposes to sell to the Kirby Lumber Company, a corporation to be organized. This proposition was accepted by the Houston Oil Company of Texas on July 17, 1901.

"On July 17, 1901, the Houston Oil Company of Texas and John H. Kirby entered into a written contract, whereby said corporation agreed to sell to Kirby the yellow pine timber standing on the oil lands, which said corporation had acquired and was in process of acquiring to the aggregate amount of 8,000,000,000 feet. This contract is set out on pages 17 to 20 of Exhibit C attached to the statement of facts.

"The timber sold is the timber on the lands which Kirby offered to convey and cause to be conveyed to the Houston Oil Company of Texas by his proposition of July 5, 1901. It is all the merchantable yellow pine timber on this land in diameter 12 inches and upwards at the stump. John H. Kirby is given 20 years in which to cut and remove the timber, paying for the timber as cut in semiannual installments; a certain amount of timber being required to be cut and paid for each year.

"On the date of its execution, this contract was assigned by Kirby to the Kirby Lumber Company, with the consent of the Houston Oil Company of Texas, and the Kirby Lumber Company assumed the obligations in the contract.

"But still the Houston Oil Company of Texas was in need of money. The Maryland Trust Company, a corporation of Baltimore, Md., and which is one of the appellees herein, was already acting as agent in securing subscriptions to the preferred stock of the Houston Oil Company of Texas. Mr. Patrick Calhoun, one of the organizers of the Houston Oil Company of Texas, was very intimate, financially and personally, with the Maryland Trust Company. Mr. Thomas H. Franklin, who became president of the Houston Oil Company of Texas at its organization, and continued to be such until some time in the year 1904, was, according to Kirby's testimony, general attorney in Texas of the Maryland Trust Company at the time the Houston Oil Company of Texas was organized, 'and remained that for some time.' Mr. Franklin was elected president of the Houston Oil Company of Texas at its organization on the request of Mr. Henry J. Bowdoin, one of the vice presidents of the Maryland Trust Company. It appears that, prior to the time the charters of the Houston Oil Company of Texas and the Kirby Lumber Company were filed, Mr. Franklin, as attorney for the Maryland Trust Company, was employed to investigate the plan for the two companies, and examined the option contracts and some of the titles to the lands to be acquired by the Houston Oil Company of Texas; that he examined and approved the charters for the two corporations and redrafted Kirby's proposition to the Houston Oil Company of Texas.

"It appears from these facts and from Kirby's testimony that the Maryland Trust Company, from the inception of the plans of the two corporations and before the filing of their charters, was assisting in financing the Houston Oil Company of Texas. The plan was devised and carried out of anticipating the payments to be made by the Kirby Lumber Company to the Houston Oil Company of Texas under the timber contract. This was done by the issuance and sale by the Maryland Trust Company of timber certificates to a large amount. These timber certificates are promises to pay the amount of same to the holder out of the proceeds of the timber contract, their payment being guaranteed by the Houston Oil Company of Texas. To secure the payment of the timber certificates, the Houston Oil Company of Texas made to the Maryland Trust Company, as trustee, a deed of assignment, transferring the timber contract, the proceeds of the same, and all the timber on the lands to the Maryland Trust Company. It also on the same date —that is, on July 31, 1901—executed a mortgage to the Maryland Trust Company on all its lands and other properties to secure its guarantee of the payment of its timber certificates. This deed of assignment and this mortgage are attached to the statement of facts as Exhibit C. The following is a brief outline of the deed of assignment:

"The deed of assignment is made in the form of a contract between the Houston Oil Company of Texas and the Maryland Trust Company. It recites that the Houston Oil Company has acquired and is acquiring oil and timber lands in Texas, and refers to the contract whereby it has agreed to sell all the timber to the Kirby Lumber Company, giving the amount of timber to be sold, the price, etc. It recites that, in order to secure the money necessary for the acquisition of the lands and other properties, the Houston Oil Company desires to anticipate the payments to be made under the timber contract and has arranged with the Maryland Trust Company to issue timber certificates for the sum of $1,000 each to the total amount of $11,000,000. The certificates are to be issued in several series, each year, beginning August 1, 1903, until August 1, 1915.

"The form of the timber certificates is embodied in the deed of assignment. It is not an absolute promise to pay, but is a promise to pay the amount of the same out of the proceeds of the timber contract between the Houston Oil Company of Texas and Kirby Lumber Company. Each certificate is guaranteed by the Houston Oil Company of Texas.

"The deed of assignment recites that the Houston Oil Company contemplates the issuance of preferred stock to an amount not exceeding $10,000,000, a portion of which has been subscribed and issued, and that the preferred stock is entitled to dividends at the rate of 6 per cent. per annum, and that the Houston Oil Company desires to provide for the payment of said semiannual dividends out of the payments made under the timber contract, and also desires to provide out of said timber payments the sum of money necessary to redeem the timber certificates.

"It recites that the Houston Oil Company for these purposes desires to assign to the Maryland Trust Company its contract with the Kirby Lumber Company, and also to assign to said Maryland Trust Company 'the actual title to and ownership of the yellow pine timber covered by and included in said contract,' and also the proceeds of the sale of the timber. It is recited that, as additional security for the payment of the timber certificates, the Houston Oil Company desires to execute a mortgage on all its lands and real property and that a copy

of its guaranty and mortgage is made a part of the deed of assignment.

"It is provided that the timber certificates shall be issued only to the extent that the lands are acquired and the titles approved after being duly examined, and that the timber certificates shall not exceed the aggregate value of the timber upon the lands owned by the Houston Oil Company under approved titles computed at the rate of $1.25 per thousand.

"After the recitals, the instrument transfers, assigns, and grants to the Maryland Trust Company, as trustee, all its right, title, and interest in and to the contract with the Kirby Lumber Company, 'and as well the full and actual right, title and ownership in and to each and all of the timber standing and being upon the lands in said contract mentioned and described as covered thereby and included therein.' The instrument contains an habendum clause whereby the said property—'that is, the said contract and timber covered thereby and all the proceeds thereof'—is to be held by the Maryland Trust Company for the purpose of collecting and receiving the money payable under the contract and to apply said money as follows:

"1. To pay the expenses connected with the administration of the trust, including all taxes to which the trustee may be subject.

"2. To apply the amount collected each year as follows· (1) To the payment of interest warrants on all outstanding timber certificates, according to a schedule attached to the deed of assignment. (2) To pay, beginning with August 1, 1903, the principal of the series of timber certificates outstanding as shown by the certificate. (3) To the payment of the installments of dividends maturing upon the preferred stock of the Houston Oil Company of Texas outstanding. (4) To the credit of the Houston Oil Company of Texas for the retirement of the preferred stock.

"It is provided that, in the event of any excess any year after the payments as above set out, it shall be applied in substance to the payment of the interest and timber certificates and dividends for the next year. It is provided that, upon the payment in full of the principal and interest on all timber certificates and the redemption and retirement of all the preferred stock, the trust shall cease and the Maryland Trust Company shall retransfer to the Houston Oil Company the interest and estate assigned.

"The Maryland Trust Company is given full authority to collect from the Kirby Lumber Company all sums due under the timber contract. In default of the payments, the Maryland Trust Company is given the right to take charge of the timber and to sell and dispose of it in accordance with the deed of assignment. The Maryland Trust Company agrees to execute and deliver to the Houston Oil Company from time to time the timber certificates provided for, in so far as the lands are acquired and the titles approved and examined as hereinbefore stipulated.

"The deed of assignment contains other stipulations which are perhaps unimportant to this suit. The Kirby Lumber Company in writing assented to the assignment of the stumpage contract with the Houston Oil Company of Texas to the Maryland Trust Company. The deed of mortgage to secure the guaranty by the Houston Oil Company of Texas of the payment of the timber certificates is set out on page 27 of Exhibit C. It covers all of the properties of the Houston Oil Company of Texas and is of the same date as the deed of assignment.

"The Pickman and Wharton Lands.

"The several tracts described in paragraphs 1, 2, and 10 of the trial court's findings of fact are the lands referred to in Schedule A attached to Kirby's original proposition of July 5, 1901, as the lands of the estate of Caroline Pickman, and the court's findings of fact and the evidence show that at the time the two corporations were organized the timber on these lands, which were school lands, was owned jointly by John H. Kirby and Pickman and Wharton. The court's findings of fact show that the timber on these lands was, at the direction of John H. Kirby, conveyed to the Houston Oil Company of Texas by Pickman and Wharton.

"The deeds by which the timber on these tracts was conveyed by Pickman and Wharton to the Houston Oil Company of Texas appear on pages 116 and 117 of the statement of facts. These deeds were identified by Mr. Kirby, and he testified that these were the same lands as those designated in the schedule as the Pickman lands. It appears from the testimony of Kirby and Wharton that Pickman and Wharton and Kirby received stock in the Houston Oil Company of Texas in payment of these lands, and that the stock was received at about the time the conveyances were made.

"The Kirby and Wing Lands.

"The lands described in paragraph 3 of the court's findings are the same lands referred to in Schedule A attached to Kirby's original proposition as the 'Wilson D. Wing Lands.' It appears from the trial court's findings and from the testimony of Mr. Kirby and the testimony of Wilson D. Wing that, at about the time the Houston Oil Company of Texas and the Kirby Lumber Company were chartered, the timber on these lands was jointly owned by John H. Kirby and Wilson D. Wing. On July 30, 1901, John H. Kirby and Wilson D. Wing conveyed the timber on these tracts to the Houston Oil Company of Texas. It appears that this deed purports to convey, not only the timber, but the land itself. It appears from the testimony of Wing that Kirby and Wing received stock in the Houston Oil Company of Texas for these lands· at about the time the conveyance was made.

"Kirby Land & Lumber Company Lands.

"The lands described in paragraphs 5, 6, 8, and 9 of the trial court's findings of fact are a part of the Kirby Land & Lumber Company's lands included in Exhibit A attached to Kirby's original proposition to the Houston Oil Company of Texas. The timber on these lands was purchased from the state by John H. Kirby and Mark Weiss, by J. W. Link, and by Jones and Rockwall, as appears from the foregoing paragraphs of the trial court's findings of fact. The timber was then conveyed to the Kirby Land & Lumber Company, and was by the latter conveyed to the Houston Oil Company of Texas on July 30, 1901, in which deed John H. Kirby joined, and which was a general deed of all the lands and timber of the Kirby Land & Lumber Company. This deed is set out in full on pages 157 and following of the statement of facts. It purports to be a deed of the land itself, and not of the timber alone.

"John H. Kirby was the president and the organizer and the principal stockholder in the Kirby Land & Lumber Company. It was dissolved in 1901, some months after the organization of the Houston Oil Company of Texas.

"Beaumont Lumber Company Lands.

"The eight tracts described in paragraph 11 of the findings of fact are a part of the lands on which the Beaumont Lumber Company owned the timber and part of the lands described in Exhibit B attached to Kirby's proposition as Beaumont Lumber Company lands. The timber on these lands was purchased from the state, as shown by the court's findings of fact, by the Beaumont Lumber Company. On February 21, 1902, this timber was conveyed by the Beaumont Lumber Company to John H. Kirby 'for the benefit of the Houston Oil Company of Texas.' It is shown by the testimony of Mr. Kirby that the Houston Oil Company of Texas acquir-

ed all of the properties of the Beaumont Lumber Company, and that the stock of the Beaumont Lumber Company was transferred to John H. Kirby to enable the Houston Oil Company of Texas to acquire its physical properties. Kirby testified that he owned the stock of the Beaumont Lumber Company only for the purpose of transferring this property, and further that he never did assert any individual claim to the Beaumont Lumber Company property.

"Sam Park or Cow Creek Tram Lands.

"The four tracts described in paragraph 12 of the trial court's findings of fact are a part of the Cow Creek Tram lands, included in Exhibit B attached to Kirby's original proposition to the Houston Oil Company of Texas. As shown by the trial court's findings of fact, the timber on these tracts was purchased by Sam Park in 1899, was conveyed by Sam Park to George Adams, and in 1902 was conveyed by George Adams to John H. Kirby. The court expressly found that this conveyance was for the benefit of the Houston Oil Company of Texas.

"The Kirby Lands.

"The lands described in paragraphs 4 and 7 of the trial court's findings of fact are a part of John H. Kirby's individual lands included in Exhibit A attached to his original proposition, as is shown by the list of the Kirby lands on page 28 of the statement of facts and by Exhibit F attached to the statement of facts. The timber on these two tracts was purchased by Kirby from the state, or from the purchasers from the state, and was, as shown by the court's findings, conveyed by Kirby to the Houston Oil Company of Texas by his deed dated July 31, 1901. These tracts are included also in a deed by Kirby to the Houston Oil Company of Texas of date September 29, 1903, appearing on pages 238 and following of the statement of facts. This deed states that it is executed in lieu of and in substitution for the deed above referred to of July 31, 1901, and also in lieu of a deed from W. W. Wilson, a kinsman of Kirby's, to the Houston Oil Company of Texas of September 29, 1903, which deeds had been lost or mislaid.

"As to the section numbered 4 in Newton county described in paragraph 13 of the court's findings of fact, it appears that the timber was acquired on this section by John H. Kirby on December 31, 1901; but there is no satisfactory evidence showing that this section was one of the tracts acquired by the Houston Oil Company of Texas.

"The lands which have been above described in the different groups include the timber lands involved in this suit, and in fact, all of the lands, with the exception of some three or four sections, which were involved in the suit as tried by the district judge after his rulings on the exceptions. The facts as to these several three or four sections will be set out more fully under the different statements. The detached lands, for the most part, were included in the Kirby and Votaw lands described in Exhibit A attached to Kirby's original proposition. It is not necessary to trace the title of these tracts for the reason that most of them were eliminated from the suit by the court's rulings on the exceptions.

"It appears from section 16 of the trial court's findings of fact that the timber lands as described above in the different groups were applied for by John H. Kirby at $2 per acre, and were awarded to him and were patented to him on the several dates shown in the schedule attached to the trial court's findings. These applications were filed late in February, in March, and April in the year 1902, except the Sam Park or Cow Creek Tram lands, the applications for which were filed in June, 1904. The lands as shown by the schedule were patented to Kir-

by a short time after the awards were made, and, for the most part, in the year 1902. Kirby's testimony shows that the money paid to the state as purchase money for the lands and for patenting them was advanced by him, but that he was reimbursed by the Houston Oil Company of Texas. After the lands were patented to Kirby, he conveyed them again by various deeds to the Houston Oil Company of Texas in the year 1902, receiving for these conveyances, according to his testimony, no additional consideration. A number of these deeds were offered in evidence by the appellees. They appear on pages 436 and following of the statement of facts. The consideration recited in each of these deeds is $1 (sometimes $10) and 'other valuable considerations.' "

Counsel for the appellees have filed able, exhaustive, and helpful briefs; and both sides made oral arguments when the case was submitted. This court has bestowed upon the case the thorough consideration which its importance demands, and our conclusions, and the reasons therefor, will be given in the following:

Opinion.

[1] 1. Counsel for the state, grouping a number of their assignments, have submitted and argued the following proposition:

"School land purchased under the preference right given to the owner of the timber by article 4218q, Revised Statutes 1895, and its amendment in 1899, must be purchased under all the terms, conditions, limitations, etc., prescribed generally by the school land law of 1895. That is to say, they can be sold only on condition of settlement; they cannot be sold to a corporation; the affidavit prescribed by article 4218j must accompany the application to purchase; the total amount of the land purchased by an applicant must not exceed four sections; the applicant must, in fact, buy the land for himself, and no other person or corporation must be in collusion with him or be interested in the purchase of the land."

Counsel for appellees deny the correctness of that proposition, and maintain: (1) That the law applicable to the sale of timber, and afterwards the land upon which it was situated, is the act of 1895, and amendments of 1897 and 1899, and that the act of 1895, being a complete revision of all former laws on the subject, operated as a repeal of such former laws, and that the validity of sales of the character involved in this case are to be determined by the act of 1895, and its amendments, unaffected by any former statute, or by any law enacted after the timber was bought and paid for. And (2) that the law then in force, consisting of the act of 1895 and the amendments referred to, authorized the commissioner of the land office to sell the timber upon timbered lands belonging to the state without any limitation or restriction as to settlement, occupancy, or who might purchase; and that, whoever purchased timber upon such lands, such purchaser or his vendee should have the right without settlement thereon and regardless of quantity to purchase the land at the price and within the time fixed by the statute, although such purchaser or vendee might be a corporation; and that the provisions of the statute and rules made by the commissioner of the land

office regulating the sale of agricultural and grazing lands had no application to any individual or corporation who had first bought the timber, and afterwards desired to purchase the land upon which the timber was situated under the terms of that portion of the act of 1895 which gave him the preferential right to purchase the land.

In our opinion, the first proposition asserted by counsel for appellees is undoubtedly correct.

The rule is well settled that, when a subsequent statute shows by its context that it was intended to embrace all the law upon the subject dealt with, such statute will, by implication, repeal all former laws relating to the same subject. The correctness of that rule is not controverted, and it is unnecessary to cite authorities in support of it. With the exception of university lands, the act of 1895 now under consideration relates to and deals with the same subject-matter as the act of 1887; and, as the same Legislature which enacted the statute under consideration passed another act, vesting the management and control of university lands in the board of regents of that institution, it is quite manifest, when the two acts are considered together, that the Legislature which enacted them intended that they should supersede the act of 1887, and all other laws relating to the sale, management and control of the public lands belonging to the state or any of its eleemosynary or educational institutions. In fact, several sections of the act of 1887 are copied and re-enacted in the act of 1895; and the first section of the latter act declares that the lands therein referred to "shall be sold and leased under the provisions of this act," though, when the codifier placed it in the revised statutes, he changed the word "act" to "chapter." If the Legislature had intended that the act of 1895 should merely add something by way of amendment to the act of 1887, it would have been entirely unnecessary to re-enact certain sections of the act of 1887, without making any change whatever in them; and, if it had not intended that the act of 1895 should stand as a substitute for all the former laws and constitute the only law relating to the lands described in that act, it would not have declared that they should be sold and leased under the provisions of that act.

[2-4] The second proposition urged on behalf of appellees is fraught with much difficulty, and if the commissioner of the land office, acting under the advice of the Attorney General's department, had not construed the act of 1895, as amended in 1897 and 1899, in accordance with appellees' contention, and if that construction had not been approved by two decisions of a Court of Civil Appeals, this court might feel constrained to put a different construction upon that statute.

The first section of the act declares that all the lands "heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the Lunatic Asylum, the Blind Asylum, the Deaf and Dumb Asylum, and the Orphan Asylum shall be sold and leased under the provisions of this act." The second section confers full power and authority upon the commissioner of the land office to carry the act into execution, and declares that:

"It shall be the duty of such commissioner to call upon the Attorney General for advice whenever there is any doubt as to the meaning of this act or any provisions thereof."

The third and fourth sections make provision for the classification of the lands, specifying three classes, which are agricultural, pasture, and timber lands. The fifth section reads as follows:

"Sec. 5. When any portion of said land has been classified to the satisfaction of the commissioner under the provisions of this act or former laws, such lands shall be subject to sale, but to actual settlers only, and in quantities of not less than forty acres, and in multiples thereof, nor more than one section containing six hundred and forty acres more or less: Provided, that when there is a fraction less than forty acres of any section left such fraction may be sold; but lands classified as purely pasture lands may be sold in quantities not to exceed four sections to the same settler."

The sixth section makes it the duty of the commissioner of the land office to notify the county clerk when any of said lands within his county are placed upon the market. The seventh section fixes the minimum prices for the different classes, being $2 for agricultural, $1.50 for pasture, and $5 per acre for timbered lands.

The eighth section undertakes to protect those who might be bona fide settlers upon the land at the time the law went into effect, by giving them a preference right to purchase.

The ninth section thereof reads as follows:

"Sec. 9. All sales shall be made by the Commissioner of the General Land Office, or under his direction, and he shall prescribe suitable regulations whereby all purchasers shall be required to reside upon as a home the land purchased by them for three consecutive years next succeeding the date of their purchase, except when otherwise provided. Such regulations shall require the purchaser to reside upon the land for three consecutive years herein mentioned, and to make proper proof of such residence and occupancy to the Commissioner of the General Land Office within two years next after the expiration of said three years, by his affidavit, corroborated by the affidavits of three disinterested and credible persons, to be certified by some officer authorized to administer oaths, and on making such proof the commissioner shall issue to the purchaser, his heirs and assigns, a certificate showing that fact. If, however, any purchaser has sold his purchase, or any part thereof, his vendee shall be permitted to compute the time of the occupancy of his vendor as a part of his own occupancy; and if any person has sold the whole or any part of his purchase under this or any former law, his vendee, or if he refuses to do so, the vendor himself, may make proof of occupancy as provided herein. Any person desiring to purchase land in accordance with the provisions of this act shall forward his application to the

commissioner, describing the land sought to be purchased, which application shall be accompanied with the affidavit of the applicant, in effect that he desires to purchase the land for a home, and has in good faith settled thereon, except where otherwise provided herein, and he shall also swear that he is not acting in collusion with others for the purpose of buying the land for any other person or corporation, and that no other person on corporation is interested in the purchase thereof. Any owner of land heretofore purchased, and which land has been or may be forfeited for nonpayment of interest, shall have ninety days prior right after this act goes into effect, or after the land is again placed upon the market, to purchase said land without the condition of settlement and occupancy, in case it has been occupied for three consecutive years as required by law; but if not, then he shall reside thereon until the occupancy under the first and last purchase shall together amount to said term of three years: Provided, that when any forfeiture has been made the Commissioner of the General Land Office shall add to the appraised value of such land the amount of interest due thereon at the time of the forfeiture, which shall be paid in cash with the first payment of one-fortieth of the appraised value of the land when purchased under the preference right to purchase given herein. Any original purchaser or his vendee of any of the lands the sale of which is provided for in this act, who has improved such land as a home, and who has been forced to temporarily abandon same on account of drouth, and who shall in good faith reoccupy the same, either by themselves or vendees, within six months after this act goes into effect, shall not have the forfeiture declared against them under the law providing for the forfeiture of such lands for nonoccupancy: Provided, that they shall make affidavit, supported by the affidavit of three disinterested witnesses, that they have reoccupied the land as a home in good faith, and that they had abandoned the same since their purchase on account of the drouth and not otherwise; and such absence shall not be deducted from the three years' occupancy required by law in making final proof of occupancy: And provided further, that any purchasers or their vendees of such lands who have failed to make proof of occupancy as required by the law regulating such purchases, shall have six months after this act shall take effect to make such proof of occupancy as required by the provisions of this act. The purchaser shall transmit to the Treasurer of the State one-fortieth of the aggregate purchase money for the particular tract of land, and send to the commissioner his obligation to the state, duly executed, binding the purchaser to pay to the state on the first day of November of each year thereafter, until the whole purchase money is paid, one-fortieth of the aggregate price, with interest at the rate of three per cent. per annum on the whole unpaid purchase money, which interest shall also be payable on the first day of November of each year; and upon receipt of one-fortieth of the purchase money by the treasurer, and the affidavit and obligation aforesaid by the commissioner, the sale shall be deemed and held effective from the date the affidavit and obligation are filed in the General Land Office: Provided, that if the land applied for be timbered land, then the purchaser shall be required to pay the full amount of the purchase money at the time of his purchase."

The tenth section confers the right upon purchasers upon making proof of three years' occupancy and payment of the full amount of the purchase money, to obtain patents to the land, and, with certain restrictions, authorizes them to sell the land before patent is issued. The eleventh section

194 S.W.—28

prescribes the necessary procedure for the protection of the state when interest is not paid when due. The twelfth, thirteenth, fourteenth, and fifteenth sections contain nothing pertinent to the decision of this case. The sixteenth section reads as follows:

"Sec. 16. The Commissioner of the General Land Office shall adopt such regulations for the sale of the timber on the timbered lands as may be deemed necessary and judicious. Such timber shall not be sold for less than five dollars per acre, cash, except in such cases as the commissioner may ascertain by definite examinations by an approved agent appointed by him for that purpose, to be paid by the purchaser, to be sparsely timbered or containing timber of but little value, in which case he may sell the timber on such sections or part of sections at its proper value: Provided, such timber is sold at not less than two dollars per acre. The purchaser shall have five years from the date of his purchase within which to remove the timber therefrom and in case of failure to do so, such timber shall thereby be forfeited to the state without judicial ascertainment: Provided, that all timbered lands from which the timber has been cut and taken off may be placed on the market and sold as agricultural or grazing lands, according to the classifications to be made by the land commissioner: Provided, that the purchaser or his vendees of any such timber shall have the right to purchase the land upon which such timber so purchased is situated at two dollars per acre, cash, at any time before the expiration of five years from the date of purchase of timber under the provisions of this act."

The seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, and twenty-third sections relate to leasing such lands, and are not important to the question under consideration. The twenty-fourth and twenty-fifth sections prescribe procedure for the purpose of preventing the use of such lands by trespassers, etc.

The twenty-sixth section, among other things, provides that:

"All sections or fractions of sections in all counties organized prior to the first day of January, 1875, except El Paso, Pecos and Presidio counties, which sections are detached and isolated from other public lands, may be sold to any purchaser except to a corporation, without actual settlement, at not less than $2.00 per acre, upon such terms as the Commissioner of the General Land Office may prescribe."

Section 27 repeals all laws in conflict with that act.

Section 28 reads as follows:

"Sec. 28. The inadequate provisions under the present law for support of the public free schools and the necessitous condition of the available school fund creates an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days be suspended, and that this act take effect and be in force from and after its passage, and it is so enacted."

Section 5 was incorporated into the Revised Statutes of 1895 as part of article 4218f; and section 16 is embraced in article 4218q, Id. Section 26 was incorporated into the Revised Statutes as article 4218y, and that article was amended by the act of 1897; the only change being that it fixed the minimum price for detached lands at $1 per acre, instead of $2, as fixed by section 26. The

amendment of 1897 also changed the former law by fixing the minimum price of agricultural lands at $1.50 per acre, grazing lands at $1 per acre, and timbered lands at not less than $5 per acre.

Section 5 of the act of 1895 was also amended by the act of 1897, so as to make it read, in part, as follows:

"Such land shall be subject to sale, but to actual settlers only, except where otherwise provided by law, and in quantities of not less than 80 acres or multiples thereof, nor more than four sections containing 640 acres, more or less."

Mr. Kirby bought the timber on all of the lands after the passage of the act of 1895, and the amendment thereto in 1897, but before the amendment of 1901, which latter act expressly requires the sale of timbered lands, though made to one who had already purchased the timber, to be made subject to and in conformity with the other provisions of the statute requiring settlement, limiting the amount of each purchase, etc. The timber purchases made prior to the act of 1899 embraced 44 tracts, and the timber purchases made thereafter embraced 63 tracts.

It is very properly conceded by counsel for the state that the law that was in force at the time Kirby purchased the timber is the law which will control in determining the validity of the sales of the land upon which the timber stood, though such sales were made after the act of 1901 took effect. Houston Oil Co. v. McGrew, 176 S. W. 45. So it will be seen that the validity of the title to a portion of the timbered lands involved the construction of the act of 1895, as amended in 1897, and the title to the other timbered lands involves, in addition to the first two acts, the proper construction to be placed upon the amendment of 1899, which amendment will be hereafter considered.

It seems to us that there is apparent, if not real, conflict between section 5 of the act of 1895, as amended in 1897, and section 16 of that act, which sections are embraced in articles 4218f and 4218q of the Revised Statutes of 1895. The fifth section, as amended, declares that such lands should be sold to actual settlers only, except where otherwise provided by law, and in quantities not to exceed four sections, which declaration seems to have been in furtherance and made for the purpose of continuing a long-established state policy to sell public lands in limited quantities and to actual settlers only, except in certain clearly specified instances; and in one of the subsequent sections of the act of 1895, as well as in the amendatory act of 1897, such an exception is specifically made in reference to detached lands, which it is declared "may be sold to any purchaser, except to a corporation, without settlement." The word "such," in the provision of the statute referred to, requiring settlement and limiting the quantity of land to be sold to each purchaser, mani-

festly refers to the lands designated in previous portions of the enactment, which lands are therein classified as agricultural, pasture, and timbered lands.

In view of these statutory provisions, it is contended on behalf of the state that the proviso contained in section 16 of the act of 1895, stipulating that any purchaser of timber, or his vendee, should have the right to purchase the land upon which the timber was grown at $2 per acre, at any time within five years from the time he purchased the timber, should be construed in connection with and as subordinate to the provisions already referred to requiring actual settlement, and limiting the amount of land to be purchased. On the other hand, counsel for appellees contend that, before the act of 1895, it had long been the policy of the state to sell timber growing upon its public lands without any restriction as to settlement, quantity, or who might purchase, and that the act of 1895 should be given the same construction, and that the provision in that section authorizing such a purchaser of the timber or his vendee to purchase the land should be held to exempt such a purchaser from the preceding portions of that statute requiring actual settlement and limiting the quantity of land which might be thus acquired.

Plausible arguments have been made in this court in behalf of each of these contentions; and, without even summarizing such arguments, we deem it sufficient to say that we regard the statute in question as ambiguous, as did the Commissioner of the General Land Office, who on June 8, 1899, propounded to the Attorney General of the state these questions:

"First. Can timbered lands be sold in any quantities to any purchaser, or must said land be sold to actual settlers only and the quantity not to exceed four sections?

"Second. Has the Commissioner of the General Land Office the authority to refuse to sell the timber on the land separate from the land?

"Third. What is the proper construction of section 16 of the act of 1895, authorizing the Commissioner of the General Land Office to sell the timber on the lands therein mentioned?"

Judge R. H. Ward, then Assistant Attorney General, on June 22, 1899, replying to that communication, wrote an elaborate opinion, in which it was held that no one, except one who had first purchased the timber upon timbered lands, could purchase more than four sections, and that such purchase must be made by an actual settler, and must not exceed four sections; but that any one who had first bought the timber would then have the right to buy the land upon which the timber stood for the price and within the time prescribed by the statute, without limitation as to settlement or quantity. Judge T. S. Reese, who was afterwards an able member of the Galveston Court of Civil Appeals, while acting as Assistant Attorney General, render-

ed an opinion to the Commissioner of the General Land Office, in which it was said:

"Under the provisions of the act of 1895, as we construe them, the purchaser of timber or timbered lands had the privilege of buying any lands on which he had bought the timber at any time within five years allowed him to take off the timber at $2 per acre cash, *without condition as to actual settlement or limitation as to the quantity*, and without reference to any classification of the land. By the provisions of section 16 of the act of 1895, the state offers to sell to any one the timber with the privilege of taking the timber off at any time before the expiration of five years from the date of the sale and also the privilege of purchasing the land at any time within five years at $2 per acre." (Italics are ours.)

And in another opinion to the same officer, the same Assistant Attorney General gave advice to the effect that, under section 16 of the act of 1895, a corporation could become the purchaser of timber, and afterwards purchase the land upon which the timber stood.

The commissioner of the land office, having sought the advice of the Attorney General's department, as directed to do by the act of 1895 whenever he had any doubt as to the proper construction of that act, followed that advice and construed the act of 1895, with the amendments of 1897 and 1899, as authorizing him to sell the timber upon any of the public lands to any one, though it be a corporation, and in any quantity; and that any one, individual or corporation, who had purchased such timber, had the right, within the time prescribed by section 16, to purchase the land upon which the timber stood, without restriction as to quantity or settlement. That construction of section 16 seems to have prevailed without challenge by the state until this suit was commenced in 1912. In the meantime, all of the timbered lands involved in this suit, as well as many others, had been sold by the commissioner of the land office in conformity with the construction so placed upon that law; and, doubtless, large sums of money have been expended upon the faith of the titles so acquired.

It is a well-settled rule of construction that when a statute is ambiguous (whether such ambiguity is brought about by direct conflict between different sections or results from the fact that the Legislature has used language susceptible of different constructions), and the construction placed upon it by the department of the government charged with its execution does not result in serious injustice or hardship, that construction will be adopted and upheld by the courts. And this is especially true when such departmental construction has been acquiesced in for a long period of time, and valuable rights have been acquired by many persons upon the faith thereof. In dealing with the rule referred to, in Tolleson v. Rogan, Commissioner, 96 Tex. 432, 73 S. W. 524, our Supreme Court said:

"We have endeavored merely to point out some of the reasons which may be urged in support of the long-continued construction of these laws made by those whose duty it was, in the first instance, to construe and execute them, in order to show that such action was not so clearly wrong as to justify the courts in disregarding it. The great weight which, from necessity, courts must give often to the contemporaneous construction put upon laws by other departments and officers to whom is committed their practical administration, is so well understood that it need not be dwelt upon. Sound public policy requires the solving of all mere doubts in favor of constructions so made and uniformly acted upon. Fitter occasion for the recognition of this could not well be imagined than controversies arising upon the construction of these land laws, extensive in their provisions and in the subjects upon which they operate, bristling with questions, and requiring at every step decisions which the commissioner must make at the peril of purchasers and others dealing with him. Upon many of his rulings are based thousands of sales, on which rest the titles of purchasers which may be destroyed by decisions in the courts reversing such rulings. While, as this court has frequently held, actions of such officers in plain opposition to law cannot be upheld, it is equally true they are entitled to great weight in determining the true construction of doubtful and indefinite regulations made for their guidance. The Legislature, in charging him with the duty of attending to this business, gave to the commissioner 'all the power and authority necessary to carry into effect the provisions of this act,' and invested him with 'full charge and discretion of all matters pertaining to the sale and lease of said lands, etc., with such exceptions and under such restrictions as may be imposed by the provisions of this act or by the Constitution.' It made it his duty to 'adopt such regulations, not inconsistent with the Constitution or this act, as may be deemed necessary for carrying into effect the provisions of this act,' and 'to call upon the Attorney General for advice whenever there is doubt as to the meaning of this act or any provision thereof.' While this was followed by such minute regulations attempting to specify, in many things, exactly what he should do and when and how he should do it, as, in many instances, to leave little room for the exercise of discretion or the making of regulations, it is nevertheless true that there must be many conjunctures in which the law is silent or is indefinite and doubtful, and in which regulations and decisions by him not inconsistent with the law are but the exercise of power expressly conferred. In the matter under consideration, admitting that there is doubt as to what action these officers should have taken in order to 'carry into effect the provisions' of these statutes, the very existence of the doubt makes it proper that their determination, so long acted upon and involving so much, should not be reversed at this late day."

In that case, as in this, the court was called upon to construe certain portions of a statute regulating the sale and lease of public lands, and there, as here, the commissioner of the land office had placed a construction upon some provisions which were not free from certainty and doubt, and what was said by the Supreme Court in that case has equal application to the case at bar, and sustains the validity of the sales of lands made to Mr. Kirby based upon timber purchases made before the amendment of 1899 took effect. And this brings us to a consideration of that amendment (Acts 26th Leg. c. 89) by which section 16 was caused to read as follows:

"Sec. 16. The Commissioner of the General Land Office shall adopt such regulations for the sale of timber on the timbered lands as may be

deemed necessary and judicious. Such timber shall not be sold for less than five dollars per acre, cash, except in such cases as the commissioner may ascertain by definite examination by an approved agent appointed by him for that purpose, to be paid by the purchaser, to be sparsely timbered or containing timber of but little value, in which case he may sell the timber on such sections or part of sections at its proper value; provided, such timber is sold at not less than two dollars per acre, and that the contract for the sale of said timber shall specify the character of timber sold; and provided further, that no timber shall be removed from the land sold except timber specified in the contract. The purchaser shall have five years from the date of his purchase within which to remove the timber therefrom, and in case of failure to do so, such timber shall thereby be forfeited to the state without judicial ascertainment; provided, that all timber lands, from which the timber has been cut and taken off may be placed on the market and sold as agricultural or grazing lands, according to classifications to be made by the land commissioner; provided, that the purchaser or his vendees of any such timber, heretofore or hereafter bought from the state, shall have the right to purchase for cash the land upon which such timber so purchased is situated, at two dollars per acre, cash, at any time before the expiration of the time allowed by law for the removal of said timber as provided by law; provided, further, that all sales of land made by the Commissioner of the General Land Office under section 16, where the land and timber thereon has been fully paid for, or which may be paid for as in said section is provided, by the purchaser or his vendee of such land and timber at the price fixed by virtue of pre-existing law, is hereby validated; this to apply to lands' upon which the timber was sold by the state prior to the above mentioned act of 1895 as well as to lands upon which the timber was so sold after the passage of said act; provided further, that any actual settler upon any of such land may have the right to purchase the land after the removal of the timber at not less than $1.00 per acre, nor more than $1.50 per acre, by paying to such purchaser of the land and timber one-fifth of the purchase price in cash, and one-fifth annually thereafter of the balance of such purchase money, with interest at six per cent. per annum; provided, that such settler shall not have the right to buy any of said lands that are actually improved or occupied by such purchaser of the land and timber in the first instance, or his assigns; and provided, said actual settler shall buy not less than one hundred and sixty acres; provided, the provisions of this act shall only apply to persons or their vendees who purchased the timber upon said lands prior to the passage of the act of 1895 and purchased said land upon which said timber was located subsequent to the passage of the act of 1895, and to whom patents have issued; provided further, that persons, or their vendees, who purchased the timber upon any of the lands mentioned in this act prior to 1895, and have complied with all of the provisions of the law in regard to the sale of such timber, shall have the right to purchase the lands upon which such timber is located at any time within six months after the passage of this act, at not less than two dollars per acre, cash; provided, that not more than four sections of such land shall be sold to any one person or persons who compose any firm, association, joint-stock company or corporation conducting, owning or controlling or doing a sawmill business in this state, it being the intention of this act to prohibit the sale of more than four sections of such land to any one person, or to any one firm, association, joint-stock company or corporation owning, controlling or conducting a sawmill in this state, and such sale shall be made in compliance with

and subject to all conditions, limitations or restrictions now provided by law regulating the sale or purchase of other public school, asylum, or university lands in this state; provided further the limitation of four sections hereinabove contained shall in no manner apply to or in any [way] affect such purchasers of said land to whom patents have heretofore issued."

What has already been said in reference to the ambiguity of section 16 of the act of 1895 before the amendment of 1899, as set out above, has equal application to that amendment. The first part of the amendment copies that section as contained in the act of 1895, with certain immaterial provisos added thereto. Then follows the same provision as in the original act, to the effect that:

"The purchaser, or his vendees, of any such timber heretofore or hereafter bought from the state, shall have the right to purchase for cash the land upon which the timber so purchased is situated at $2 per acre cash, at any time before the expiration of the time allowed by law for the removal of said timber, as provided by law."

Then follow certain provisos intended for the protection of actual settlers upon timbered lands, and certain other provisos, which conferred the right upon those who had purchased timber prior to 1895, to purchase the land upon which the timber was located, with the proviso that not more than four sections of such land should be sold to any one person or persons who compose any firm, association, joint-stock company or corporation conducting, owning, or controlling or doing a sawmill business in this state; and it is stated that such sale shall be made in compliance with and subject to all conditions, limitations, or restrictions now provided by law regulating the sale or purchase of other public school, asylum, or. university lands in this state. In the case at bar, all the timber purchases were made after 1895, and therefore the provisions of the above amendment relating to the right to purchase lands, based upon the fact that the vendee had purchased the timber prior to the act of 1895, can have no application to this case.

It will also be noted that this amended section, like the original, contains no requirement of actual settlement; nor does it limit the number of acres which may be purchased by one who has purchased the timber subsequent to the act of 1895; nor does it prohibit a corporation from becoming the purchaser of timber and the land upon which it is situated. So we conclude that the amendment to section 16, enacted in 1899, as applied to the facts of this case, does not require a different construction from that which had previously been placed upon that section by the commissioner of the land office; and, as the conflict which exists between that section and sections 5 and 9 renders the act ambiguous, and as the commissioner of the land office (who is charged with the duty of administering such law), acting upon the advice of the Attorney General, has held that it did not prohibit a corporation from purchasing lands after having

become the purchaser of the timber thereon, and did not require actual settlement or limit the quantity of land that might be so purchased, we feel constrained to adopt that construction as applied to this case. The Court of Civil Appeals at Galveston, in Hooks v. Kirby, 58 Tex. Civ. App. 335, 124 S. W. 156, and Wing v. Dunn, 60 Tex. Civ. App. 16, 127 S. W. 1101, has sustained that construction.

[5] What has already been said renders it immaterial whether or not, at the time Mr. Kirby bought the land, the timber thereon belonged to him or to the Houston Oil Company. The undisputed proof shows that he was acting for the benefit of both the oil company and himself; and, if he did not at that time own the timber, the oil company did; and as the title to both the land and the timber was subsequently conveyed by Kirby to the oil company, and as the state has received the contract price for both the timber and the land, it has no just ground of complaint.

This disposes of the main questions involved in this appeal, and the length of this opinion precludes extended discussion of the other questions. In fact, much that has already been said has application to the laws governing title to the other lands. Suffice it to say that the laws then in force did not place all the limitations and restrictions that govern in the sale generally of agricultural and pasture lands to what was known as isolated and detached lands. Weber v. Rogan, 94 Tex. 62, 54 S. W. 1016, 55 S. W. 559, 57 S. W. 940. We also hold that the court made the proper rulings in reference to the tracts designated "the settlement lands."

[6] As to the question presented in appellant's brief to the effect that the case should be reversed and the state permitted to recover the lands, upon the theory that the charter of the Houston Oil Company did not authorize it to become the purchaser of the timber which formed the basis of title for most of the lands, we deem it sufficient to say that, if that contention be correct, it does not follow that the state is entitled to recover the land and timber for which it has been paid by Mr. Kirby and others. If the corporation is exceeding its charter powers by the acquisition and use of property which its charter does not authorize, the state, in a proper proceeding, might obtain a judgment forfeiting its charter, or requiring it to divest itself of such property; but, if such be the facts, the state has no right to recover the property. Besides, if the corporation had no power to acquire the ownership of the timber, it would seem that such ownership remained in Mr. Kirby, who bought the timber from the state; and, if so, he had the right, even without any conveyance from the Houston Oil Company, to purchase the land as he did do; and, as said before, if the Houston Oil Company has no right to own the land and the timber

thereon (which, however, we do not hold), that fact does not authorize the state to cancel the patents issued by it and recover the lands. Appellees have presented some other questions which we deem it unnecessary to decide.

Upon the whole case, our conclusion is that no reversible error has been pointed out, and therefore the judgment is affirmed.

Affirmed.